# United States Court of Appeals
# for the Sixth Circuit
### CASE NO. 22-5150

| | | |
|---|---|---|
| **SISTERS FOR LIFE, INC.,** | : | |
| **ANGELA MINTER, AND** | | On Appeal from the U.S. |
| **KENTUCKY RIGHT TO LIFE,** | : | District Court for the Western |
| **INC.** | | District of Kentucky |
| | : | 3:21-cv-00367 |
| Plaintiffs/Appellants | | |
| | : | |
| And | | |
| | : | |
| **EDWARD HARPRING AND** | | |
| **MARY KENNEY** | : | |
| | | |
| Plaintiffs | : | |
| v. | | |
| | : | |
| **LOUISVILLE-JEFFERSON** | | |
| **COUNTY, KY METRO GOVT;** | : | |
| **GREG FISCHER, Mayor; ERIKA** | | |
| **SHIELDS, Chief of Police; MIKE** | : | |
| **O'CONNELL, County Attorney** | | |
| | : | |
| Defendants/Appellees | | |
| | : | |

## PLAINTIFFS/APPELLANTS REPLY BRIEF

Christopher Wiest (KBA 90725)          Thomas Bruns (KBA 84985)
Chris Wiest, Atty at Law, PLLC          Bruns Connell Vollmar &Armstrong
25 Town Center Blvd, Suite 104          4555 Lake Forest Dr., Suite 330
Crestview Hills, KY 41017               Cincinnati, Ohio 45242
Tel:   513/257-1895                     Tel.:   513/312-9890
chris@cwiestlaw.com                     tbruns@bcvalaw.com


*Attorneys for Plaintiffs/Appellants Sisters for Life, Inc., Angela Minter, and*
*Kentucky Right to Life, Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................... i

TABLE OF AUTHORITIES.................................................................. ii

RESPONSE TO APPELLEE'S STATEMENT OF THE CASE ...................... 1

SUMMARY OF THE ARGUMENT .................................................... 3

ARGUMENT ................................................................................... 3

I.      The District Court erred in denying a Preliminary Injunction to
Plaintiffs……………………………………………………………….....3

   A.  Standard for Preliminary Injunctions, and Standard of Review.......... ..3

   B.  Likelihood of Success -- The First Amendment's Free Speech
Guaranties were violated…………………………………………...4

      1.  The restrictions at issue constitute as-applied viewpoint
discrimination…………………………………………………..… 8

      2.  The buffer zone ordinance is not narrowly tailored and does not leave
open ample alternatives even if it is content and viewpoint neutral…....10

   C.  Likelihood of Success -- The First Amendment's Free Exercise
Guaranties and Kentucky's RFRA were violated………………...…23

   D.  Plaintiffs also established irreparable harm, the harm to others factor,
and that issuance of an injunction was in the public interest…………..25

CONCLUSION .............................................................................27

CERTIFICATE OF SERVICE........................................................28

CERTIFICATE OF COMPLIANCE…………………………………..29

## TABLE OF AUTHORITIES

### Cases:

*Aids Action Comm. v. Massachusetts Bay Transp. Auth.,* 42 F.3d 1 (1st Cir. 1994)…………………………………………………………………….. 10

*Citizens United v. FEC*, 558 U.S. 310 (2010)...................................................... 24

*City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427 (6th Cir. 2014)….4

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984)………….. 11

*Elrod v. Burns*, 427 U.S. 347 (1976)...................................................................... 27

*Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010)……………….... 27

*Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998)..................................... 10

*G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071 (6th Cir. 1999)... 28

*Hart v. Thomas*, 422 F. Supp. 3d 1227 (EDKY 2019)......................................... 10

*H.D.V. - Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009).......... 27

*Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981) ………………………………………………………..21

*Hill v. Colo.*, 530 U.S. 703 (2000).......................................................11, 12, 13, 14

*Jobe v. City of Catlettsburg*, 409 F.3d 261 (6th Cir. 2005)……………………….. 4

*Jones v. Caruso*, 569 F.3d 258 (6th Cir. 2009)....................................................... 3

*L.D. Mgmt. Co. v. Thomas*, 2020 U.S. Dist. LEXIS 72593 (WDKY 2020).......... 10

*Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020)............. 27

*McCullen v. Coakley*, 573 U.S. 464 (2014)................................................... *passim*

*McNeilly v. Land*, 684 F.3d 611 (6th Cir. 2012).................................................. 27

*Nieto v. Flatau*, 715 F. Supp. 2d 650 (EDNC 2010)............................................. 10

*Planet Aid v. City of St. Johns*, 782 F.3d 318 (6th Cir. 2015)............................. 27

*Reno v. ACLU*, 521 U.S. 844 (1997).................................................................. 21

*Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020)......................................24, 25, 27

*Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020).................................. 25

*Russell v. Lundergan-Grimes*, 784 F.3d 1037 (6th Cir. 2015)............................ 24

*Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011)............................. 14, 22

*Suster v. Marshall*, 149 F.3d 523 (6th Cir. 1998)................................................. 3

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021)......................................................... 25

*Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, 2013 U.S. Dist. LEXIS 4923
(SDOH 2013)........................................................................................................ 10

*Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002)............................................. 9

*United States v. Grace*, 461 U.S. 171 (1983)...................................................... 21

*U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803 (2000)...................................3, 4

*Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021)............................................ 27, 28

*Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012)...................................................... 10

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)........................................ 4, 11

**Statutes:**

Louisville Ordinance O-179-21.................................................................. *passim*

**RESPONSE TO APPELLEES' STATEMENT OF THE CASE**

Appellees offer a "statement of facts" that largely isn't, as it is belied by the legislative record, and is otherwise full of hearsay statements.  (R. 27 at 1-3).  For instance, Appellees successfully argued below that these same objected to, inadmissible hearsay statements justified their actions.  These include hearsay reports from the National Abortion Federation (DE#53-2, PageID#2251-2252), a link to a hearsay video from EMW (DE#53-3, PageID#2253), a hearsay letter from an abortion rights group (DE#53-4, PageID#2254-2257), and an unauthenticated hearsay statement from Maggie Fitzgerald that itself purports to recount things others told her. (DE#53-5, PageID#2258).  Appellees also relied on a self-serving declaration from clinic escort Meg Stern asserting that engaging in pro-abortion communication on the sidewalk was not within the scope of duties for clinic escorts. (DE#53-8, PageID#2263-2264).

Initially, the reports from the EMW Clinic and the National Abortion Federation (NAF), or other third parties, are not admissible. FRE 803; FRE 805. Such reports by third parties, particularly those having a vested interest in passage of the Ordinance, should not be deemed trustworthy.  This is particularly true where, as is the case here, such reports conflict with police reports concerning the same activity and period of time. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988).

Even Appellees' own FRCP 30(b)(6) witness acknowledged that reports from EMW were unreliable. (Depo. Stewart, DE#47, PageID#2025).

In terms of the Stern declaration, even if credited it changes nothing. That is because unrebutted evidence established that clinic escorts regularly engage in pro-abortion conversations within the buffer zone and escorts regularly block the efforts of sidewalk ministers while the escorts are within the buffer zone. (Depo. Minter, DE#47, PageID#1837, 1848-1851; Depo. Harpring, DE#45, PageID#1897-1901; Depo. Kenney, DE#46, PageID#1931-1932). Even assuming Ms. Stern's declaration was true, the fact is established that escorts regularly engage in conduct outside the scope of their duties: (i) but have never had the Ordinance enforced against them by the City; and (ii) Lt. Stewart testified that he would not enforce it against them. (Depo. Stewart, DE#47, PageID#2011-2013; 2036-2037).

Just as significantly, both the District Court below, and Appellees here, never addressed other unrebutted, material evidence. This includes the factual allegations in the Second Amendment Complaint, verified with the declaration of Angela Minter. (Pl's Second Amended Compl., DE#28, ¶2, PageID#1475-1484; Declaration of Angela Minter, at DE#49-2, PageID#2216-2217), and other material testimony relied on by Appellants, which includes admissions by Appellees' own FRCP 30(b)(6) witness. (Depo. Minter, DE#44; Depo. Harpring,

DE#45; Depo. Kenney, DE#46; Depo. Stewart/FRCP 30(b)(6) Deposition,

DE#47].  This specific, unrebutted material testimony is further addressed below.

## SUMMARY OF THE ARGUMENT

The District Court erred in denying Plaintiffs/Appellants' Renewed Motion

for Preliminary Injunction.

## ARGUMENT

### I.     The District Court erred in denying a Preliminary Injunction to Plaintiffs/Appellants

#### A. Standard for Preliminary Injunctions, and Standard of Review

When deciding whether to issue a preliminary injunction, a court must

consider the following four factors: (1) Whether the movant has demonstrated a

strong likelihood of success on the merits; (2) Whether the movant would suffer

irreparable harm; (3) Whether issuance would cause substantial harm to others; and

(4) Whether the public interest would be served by issuance. *Suster v. Marshall*,

149 F.3d 523, 528 (6th Cir. 1998).

However, when analyzing a motion for preliminary injunction, "the

'likelihood of success' prong is the most important [factor] and often determinative

in First Amendment cases." *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009).

With respect to the "likelihood of success" prong, and because First Amendment

rights are at issue, it is Appellees, not Appellants, who bear the burden of

establishing the constitutionality of the challenged legislation. *U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 816 (2000).

On appeal, "[w]hether the movant is likely to succeed on the merits is a question of law we review *de novo*[,] [but] [w]e review for abuse of discretion . . . the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc).

### B. Likelihood of Success -- The First Amendment's Free Speech Guaranties were violated

Generally, the review of a restriction on speech in a public forum begins with the question of whether the restriction is content-based. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 326 (6th Cir. 2015). Content-based restrictions are subject to strict scrutiny. *Jobe v. City of Catlettsburg*, 409 F.3d 261, 266 (6th Cir. 2005). However, content-neutral restrictions on the time, place, or manner of communication are generally subject to an intermediate level of scrutiny, in which courts ask whether the restriction is "narrowly tailored to serve a significant governmental interest" and, if so, whether it "leave[s] open ample alternative channels for communication of the information." *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

4

In aid of the Court's analysis here, it is important to recount the unrebutted, material facts the District Court inexplicably ignored in its erroneous analysis, and which Appellees likewise failed to address in their briefing.

The following testimony of Ms. Minter was <u>unrebutted:</u> For purposes of her ministry, it is critical to approach people entering the clinic in a caring demeanor, with a calm voice, and to maintain eye contact with them. (Depo. Minter, DE#44, at 20, PageID#1821).  Many mornings, protestors are present. *Id.* at 21; PageID#1822.  EMW clinic escorts operate a vehicle shuttle that drops patrons off right in front of the door and, when this happens, sidewalk counselors, who have to remain outside the buffer zone, have less than 10 seconds from the time that person exits the vehicle to the time they are inside. *Id.* at 23; PageID#1824.

Ms. Minter's ministry and counselors have saved over 900 children from abortions over the past 18-19 years. *Id.* at 37-38; PageID#1838-1839.  But the Ordinance has changed things, and rendered them largely unable to perform their ministry. *Id.* at 40; PageID#1840.  Between the women being dropped off by the EMW shuttles, and sidewalk counselors remaining outside the buffer zone all while being drowned out by loudspeakers, the result is the elimination of their ability to approach and speak to women and conduct their ministry in the manner that made it so successful. *Id.* at 44-45; PageID#1845-1846.

This is significant because also unrebutted, and binding on Appellees herein, is Lt. Stewart's testimony confirming that local groups – the sidewalk counselors – were not the people causing any issues. (Depo. Stewart/FRCP 30(b)(6) Deposition, DE#47 at 49-50, PageID#2004-2005). In fact, Lt. Stewart confirmed that sidewalk counselors do not appreciate the presence of protestors with loudspeakers, because that negatively impacts the ministry of the counselors. *Id.* at 51, PageID#2006. Specifically, he acknowledged that it is hard to initiate a soft intimate conversation when loudspeakers are blaring in the background. *Id.* at 51-52, PageID#2006-2007.

The videos were also unrebutted, which depicted protesters using loudspeakers outside the clinic (Exhibit 12), videos of a loudspeaker in operation with a sidewalk counselor trying to be heard over it (Exhibit 13), EMW shuttles in operation with patrons being dropped off and documenting the limited time for sidewalk counselors to interact with patrons (Exhibit 14), EMW clinic shuttles in operation, the operation of loudspeakers, and the need to get close to patrons to have an intimate conversation (Exhibit 15). *Id.* at 72-81, PageID#2027-2036; Exhibits 12, 13, 14, and 15. These videos, all of which depict operations outside the EMW Clinic, were filed conventionally in the District Court (DE#48, PageID#2187-2188; DE#50, PageID#2219-2222), and authenticated with the Declaration of Angela Minter, which was attached to Plaintiffs/Appellants' renewed Motion for a Preliminary Injunction. DE#49-2, PageID#2216-2217.

To the extent they even address the above, Appellees take out of context (and in some cases completely misrepresent), the relevant testimony of Ms. Minter, Mr. Harpring, and Ms. Kenney. (R. 27 at 21-22).  Ms. Kenney, for instance, testified that "occasionally" a woman will see her and stop and talk to her (Ms. Kenney did not testify that she could be heard over bullhorns as Appellees suggest). (Depo. Kenney, RE#46, PageID#1928).  And Mr. Harpring testified that "occasionally" a person will see him and stop and stop and talk (but he did not testify that he could be heard over bullhorns). (Depo. Kenney, RE#56, PageID#1898).  And, Appellees dishonestly quote from Ms. Minter's testimony (R. 27 at 22).  Her actual testimony was that the clinic escorts can be heard talking loudly in the clinic patients' ears right next to them, and that Ms. Minter can hear this.  S*he did not testify that she could be heard by the patients*, and certainly not in the quiet and caring manner in which she attempts to conduct her ministry. (Depo. Minter, RE#4, PageID#1843).

Now the law.  Public streets and sidewalks, such as where this buffer zone exists, are traditional public forums, triggering public forum analysis. *McCullen v. Coakley*, 573 U.S. 464, 476-477 (2014).  To begin, the Government's ability to restrict speech in such locations is "very limited." *Id.*  Restrictions in such areas can be upheld only if they are "reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without

reference to the content of the regulated speech, they are narrowly tailored to serve a significant governmental interest, and they leave open alternative channels for communication of the information." *Id.* at 477.

The tailoring requirement "does not simply guard against an impermissible desire to censor." *Id.* at 486. That is because it is also impermissible for the government to attempt "to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience." *Id.* "But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.*

1. <u>The restrictions at issue constitute as-applied viewpoint discrimination</u>

Appellees do not meaningfully address the <u>unrebutted</u> evidence of record that the clinic escorts regularly engage in pro-abortion speech, block sidewalk counselors, snatch literature out of their hands, and tell patrons within the buffer zone to ignore the sidewalk counselors. (Depo. Minter, DE#44 at 47-50; PageID#1848-1851; Depo. Harpring, DE#45 at 25-26, PageID#1897-1898; Depo. Kenney, DE#46 at 18-20, PageID#1930-1932). They likewise ignore the fact that Lt. Stewart ***admitted he would not prosecute these clinic escorts*** under the Ordinance, and the fact that none of these individuals have been prosecuted. (DE# 47, PageID# 2011-2013;2036-2037).

8

As *Coakley* made clear, "an exemption from an otherwise permissible regulation of speech may represent a governmental 'attempt to give one side of a debatable public question an advantage in expressing its views to the people.'" *Id.* at 483.  And, in *Coakley*, the Court also observed that "[i]t would be a very different question if it turned out that a clinic authorized escorts to speak about abortion inside the buffer zones." *Id.* at 484.  "In that case, the escorts would not seem to be violating the Act because the speech would be within the scope of their employment." *Id.* at 484-485.  "The Act's exemption for clinic employees would then facilitate speech on only one side of the abortion debate—a clear form of viewpoint discrimination that would support an as-applied challenge to the buffer zone at that clinic." *Id.* at 485.

Without question, viewpoint discrimination occurs when a set of rules that may not be viewpoint discrimination on their face, become so in an as-applied manner when some speech is permitted or encouraged, but where other speech is discouraged. *Coakley*, 573 U.S. 464 at 484-485 (noting that permitting one class of speakers to speak and not another raises questions of viewpoint discrimination).  It goes without saying that "[g]ranting waivers to favored speakers (or . . . denying them to disfavored speakers) would of course be unconstitutional." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002).

Courts have not hesitated to find as-applied viewpoint discrimination in situations such as these – and Appellees did not address these cases at all in their Brief, just like they ignored the unrebutted evidence establishing the relevance of these cases.  Quite likely, they failed to respond because, on this record, they have no response. *Aids Action Comm. v. Massachusetts Bay Transp. Auth.*, 42 F.3d 1, 9-12 (1st Cir. 1994); *Nieto v. Flatau*, 715 F. Supp. 2d 650, 655 (EDNC 2010); *L.D. Mgmt. Co. v. Thomas*, 2020 U.S. Dist. LEXIS 72593 (WDKY 2020); *Teufel v. Princeton City Sch. Dist. Bd. of Educ.*, 2013 U.S. Dist. LEXIS 4923 (SDOH 2013); *Hart v. Thomas*, 422 F. Supp. 3d 1227 (EDKY 2019); *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998) (explaining as-applied viewpoint and content based discrimination); *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) (explaining how enforcement of otherwise neutral policies becomes as-applied discrimination and is unconstitutional).

Based on the foregoing, there is as-applied viewpoint discrimination.

2. The buffer zone ordinance is not narrowly tailored and does not leave open ample alternatives even if it is content and viewpoint neutral

In public forums, and assuming a restriction is content neutral, government may impose reasonable restrictions on the time, place, or manner of protected speech only if the restrictions are (i) narrowly tailored to serve a significant governmental interest; and (ii) leave open ample alternative channels for

10

communication of the information. *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Ward*, 491 U.S. 781, 791.

Here, and even if the Ordinance does not amount to content and viewpoint discrimination on an as-applied basis, it is not narrowly tailored, and it fails to leave open ample alternative channels for Appellants to communicate.

In their Brief, Appellees double down on their insistence that this case is akin to *Hill v. Colo.*, 530 U.S. 703 (2000), and they do so without any meaningful analogizing of the relevant facts in *Hill* to the unrebutted, relevant evidence here. But *Hill* involved an ordinance that was far narrower and far less burdensome to Appellants' mode of communication than the Ordinance here is, as the ordinance in *Hill* only made it "unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person.'" *Id.* at 707.  And significant to the outcome in *Hill* was the Court's observation that, "[a]lthough the statute prohibits speakers from approaching unwilling listeners, **it does not require a standing speaker to move away from anyone passing by,**" and it placed no restrictions on the content of any message anyone wanted to communicate within the restricted area. *Id.* at 708. (emphasis added).

11

Consequently, *Hill* upheld the Colorado statute for reasons simply not applicable to the Ordinance here.  Namely, that the ordinance only applied to the right to be free from un-consented to communications, which the **8-foot floating, rather than fixed,** buffer zone achieved, because the statute simply did not have any effect on speech where there was a willing listener. *Id.* at 718.  In contrast, the Ordinance here creates a 10-foot, fixed buffer zone that applies regardless of whether those entering or exiting the facility consent to the communication, applies to an entire area in front of the clinic, rather than merely prohibiting someone from blocking access to the clinic, and effectively prohibits the close contact messaging Appellants' entire, formerly effective, ministry is based upon.  Not surprisingly, Appellees never address these significant distinctions.

Unlike Appellees, and the Court below, the *Hill* Court analyzed the actual speech the protesters in that case engaged in, and determined that [unlike Appellants here] they would continue to be able to do so despite the 8-foot floating buffer, even going further and observing that in some regards, some speech [such as the sidewalk counseling that Appellants here engage in] might be furthered by the floating buffer. *Id.* at 726.  Here, the opposite is true.  Here, the unrebutted, record evidence is that other protester speech with bullhorns actually requires Appellants to get closer than would otherwise be required to have the type of intimate conversation necessary to carryout effective sidewalk counseling. (Depo.

12

Stewart, DE#47, at 51-52, PageID#2006-2007.  Depo. Minter, DE#44, at 20, 21, 23, 40, 44-45, PageID#1821, 1822, 1824, 1840, 1845-1846).  In fact, the video evidence definitively established this reality that the Court below simply ignored. (Depo. Stewart, DE#47 at 72-81, PageID#2027-2036; Exhibits 12, 13, 14, and 15).

In terms of these relevant distinctions, the *Hill* Court left no doubt when it observed:

> Unlike the 15-foot zone in *Schenck*, this 8-foot zone allows the speaker to communicate at a "normal conversational distance." *Ibid.* Additionally, the statute allows the speaker to remain in one place, and other individuals can pass within eight feet of the protester without causing the protester to violate the statute. Finally, here there is a "knowing" requirement that protects speakers "who thought they were keeping pace with the targeted individual" at the proscribed distance from inadvertently violating the statute.  530 U.S. 703 at 726-727.

Once again, here, [and unlike in *Hill*] the Ordinance entirely eliminates sidewalk counselors' ability to have conversations at a normal conversational distance with those entering and exiting the clinic.  This is due to the fixed nature of the buffer zone that contains no exceptions for sidewalk counselors to locate themselves within the zone, coupled with clinic escort tactics of shuttle drop off, blocking and other tactics, and the effects of loud speakers drowning out the counselors who have to remain outside the fixed, 10 foot zone. (Depo. Stewart, DE#47, at 51-52, PageID#2006-2007; Depo. Minter, DE#44, at 20, 21, 23, 40, 44-45, PageID#1821, 1822, 1824, 1840, 1845-1846).  Appellees simply do not address this reality.

The inapplicability of *Hill* to this record could not be clearer and is further demonstrated by the finding of the Court in *Hill* that the 8-foot floating buffer there actually "might encourage the most aggressive and vociferous protesters to moderate their confrontational and harassing conduct, and thereby make it easier for thoughtful and law-abiding sidewalk counselors like petitioners to make themselves heard." 530 U.S. 703 at 727. Here, the unrebutted evidence proves the exact opposite is true.

And, it's not just the facts and reasoning from *Hill* that undermine its application to these facts. The fallacy of the Court below relying upon *Hill* is also made clear by this Court's admonition that "[a]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011). Once again, unrebutted evidence proves that Appellants are not able to reach their intended audience. Between the effects of clinic shuttles, the tactics of clinic escorts, and other protesters using loud speakers, the unrebutted testimony was that Appellants are unable to reach their intended audience. (Depo. Minter, DE#44, at 20, 21, 23, 40, 44-45, PageID#1821, 1822, 1824, 1840, 1845-1846). Once again, Appellees do not meaningfully address this evidence or these distinctions in their brief.

As opposed to the floating buffer zone in *Hill*, the Supreme Court's decision in *Coakley*, 573 U.S. 464 dealt with what we deal with in this case: a fixed buffer

14

zone. While it is true that the Ordinance here, from a distance perspective, is more modest than the 35-foot zone in *Coakley*, [the Ordinance here applies from the entrance to the closest curb and 10 feet from side to side] other considerations compel a similar outcome. That is because the effects of the Ordinance here are legally indistinguishable from those in *Coakley*.

Here, as in *Coakley*, Appellants' "attempts to communicate with patients are further thwarted, they claim, by clinic 'escorts,' who accompany arriving patients through the buffer zones to the clinic entrances." *Id.*

Here, as in *Coakley*, "[t]he buffer zones have displaced petitioners from their previous positions outside the clinics." *Id.* at 473. And here, as in *Coakley*, "the buffer zones have considerably hampered their counseling efforts." *Id.* at 474.

Here, as in *Coakley*, "the buffer zones impose serious burdens on petitioners' speech." *Id.* at 487. Distance notwithstanding, unrebutted record evidence makes clear that the "zone thereby compromise[s] [Appellants'] ability to initiate the close, personal conversations that they view as essential to 'sidewalk counseling.'" *Id.*

Here, as in *Coakley*, the effects of the buffer zone, coupled with blaring loudspeakers by other protesters, a shuttle drop off effort by EMW, and blocking and other tactics by clinic escorts, require Appellants often to be "reduced to

15

raising [their] voice at patients from outside the zone—a mode of communication sharply at odds with the compassionate message [they wish] to convey." *Id.*

Here, as in *Coakley*, "[t]hese burdens on [Appellants'] speech have clearly taken their toll." *Id.*  This buffer zone Ordinance constitutes a "catastrophic" detriment to Appellants' ministry, where unrebutted evidence demonstrated that prior to the Ordinance, Ms. Minter and her sidewalk counselors were able to change the minds of 3 to 6 women a month, but since September, 2021, and the enactment of the Ordinance, that number has fallen to zero. (Depo. Minter, DE#44, at 54-55; PageID#1855-1856).  Appellees do not address these similarities, likely because they cannot.

Here, as in *Coakley*, the District Court and Appellees are simply "wrong to downplay these burdens on [Appellants'] speech." 573 U.S. 464, 488.  In part, that is because normal conversation has "historically been more closely associated with the transmission of ideas than others." *Id.*  And, "'one-on-one communication' is 'the most effective, fundamental, and perhaps economical avenue of political discourse.'" *Id.*

The Ordinance created need to raise one's voice in protest is not a substitute for Appellants' longstanding practice of soft, persuasive conversations because, as the Supreme Court stated in *Coakley*:

> Petitioners are not protestors. They seek not merely to express their opposition to abortion, but to inform women of various alternatives and to

16

provide help in pursuing them. Petitioners believe that they can accomplish this objective only through personal, caring, consensual conversations. And for good reason: It is easier to ignore a strained voice or a waving hand than a direct greeting or an outstretched arm. While the record indicates that petitioners have been able to have a number of quiet conversations outside the buffer zones, respondents have not refuted petitioners' testimony that the conversations have been far less frequent and far less successful since the buffer zones were instituted. ***It is thus no answer*** to say that petitioners can still be "seen and heard" by women within the buffer zones. If all that the women can see and hear are vociferous opponents of abortion, then the buffer zones have effectively stifled petitioners' message. *Id.* at 489-490. (emphasis added).

And here, as in *Coakley*, "[t]he buffer zones burden substantially more speech than necessary to achieve the [City's] asserted interests." *Id.* at 490. Here, as in *Coakley*, the City "has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage." *Id.*

The Court below entirely skipped the examination of alternatives Appellees could have pursued but did not. The *Coakley* analysis *requires courts* to consider that the Government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Coakley*, 573 U.S. 464, 486. And, by looking at effects on speech (what the First Amendment actually protects), rather than solely on distance as the Court below did, it gives effect to the statement in *Coakley* that "by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" *Id.*

17

In determining that the fixed buffer zone in *Coakley* failed this test, the Supreme Court in *Coakley* did not mince its words stating that "the Act is truly exceptional." But, contrary to the false conclusion of the District Court, and Appellees in their brief, that observation had nothing to do with the size of the buffer zone at issue. *Id.* at 490. Rather, that ordinance was "truly exceptional" because, as is the case here, the "law … create[d] fixed buffer zones around abortion clinics." *Id.* And in *Coakley*, as here, the City's "interests include ensuring public safety outside abortion clinics, preventing harassment and intimidation of patients and clinic staff, and combating deliberate obstruction of clinic entrances." *Id.* But, in *Coakley*, as here, the ordinance "itself contains a separate provision," [as §B(1) of the Ordinance here does], which "prohibits much of this conduct." *Id.*

Other less burdensome options, outlined in *Coakley*, *see id.*, were also available to Appellees here, including other less burdensome legislative options and enforcement of existing laws, including seeking injunctions. Moreover, that these other options were sufficient is not contested, as Appellees' FRCP 30(b)(6) witness ***confirmed that existing laws were sufficient to deal with those wo blocked clinics***. (Depo. Stewart, DE#47 at 22-35, PageID# 1977-1990). And, Lt. Stewart did not know if the City could have merely passed an anti-congregation ordinance as opposed to a buffer zone ordinance. *Id.* at 101; PageID#2056.

18

True, in their brief Appellees make various arguments regarding alternatives to their buffer zone, but their arguments are belied by their own witnesses' testimony.  (R. 27 at 20-22).  And testimony, not mere unsupported argument, should carry the day.

Specifically, Lt. Stewart admitted that the clinic has video that can be reviewed if there are incidents, which video then could be used for trespassing charges, civil injunctions, or blocking sidewalk charges. *Id.* at 59, 99, PageID#2010, 2054.  In fact, the police could just tell someone who was obstructing to move and, if they did not, probable cause would exist that they were obstructing access. *Id.* at 100, PageID#2055.  Lt. Stewart also acknowledged the City could issue orders to disperse. *Id.* at 96, PageID#2051.

Although prior to the Ordinance Appellees did pursue criminal charges where appropriate, the City never obtained or even sought any injunctions against persons causing trouble. *Id.* at 90-92, PageID#2045-2047.  In fact, Lt. Stewart acknowledged a number of existing laws and ordinances were on the books prior to the enactment of the Ordinance that could address issues. *Id.* at 62-64, PageID#2017-2019; Exhibit 7, DE#47-8, PageID#2130-2138.  However, he admitted that the justification for the Ordinance was that ***it made life easier***, because it is easy to enforce an ordinance that restricts people ***from going between painted lines***. *Id.* at 99, 122-123; PageID#2054, 2077-2078.  As with the other

19

significant admissions in this matter, these also were ignored by Appellees. However, the Court below was wrong to ignore these admissions as the Supreme Court in *Coakley* observed, "[w]e have previously noted the First Amendment virtues of targeted injunctions as alternatives to broad, prophylactic measures." *Id.* at 492.

As in *Coakley*, the City "has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 493-494.  And, although a content-neutral regulation "need not be the least restrictive or least intrusive means of serving the government's interests,"…"the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 486.

When considering content-neutral regulations, the Court itself has examined alternative approaches to achieving the government's objective to determine whether the government's chosen approach burdens substantially more speech than necessary. *Id.* at 490-494.  That is, the government may not "forgo[] options that could serve its interests just as well," if those options would avoid "substantially burdening the kind of speech in which [Appellants'] wish to engage." *Id.* at 490. "The point is not that [the government] must enact all or even any of the proposed [alternative approaches]." *Id.* at 493.  "The point is instead that the [government]

has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 493-494. Thus, "[t]o meet the requirement of narrow tailoring [in the context of content-neutral regulations], the government ***must demonstrate*** that alternative measures that burden substantially less speech ***would fail to achieve the government's interests***, not simply that the chosen route is easier." *Id.* at 495. (emphasis added). Here, Appellees spectacularly failed to make this required showing, but the Court below erroneously determined that failure did not matter. Now, Appellees also fail to address these issues in their Brief.

The Supreme Court has stressed the importance of providing access for exercise of First Amendment rights "within the forum in question." *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981). "One is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Reno v. ACLU*, 521 U.S. 844, 880 (1997).

Limiting all sidewalk counseling to ***at least five feet away***, where clinic escorts engage in blocking and other tactics, and protestors engage in their protest using bullhorns, eliminates the ability to engage in the kind of intimate conversations Appellants wish to have. It is no constitutional substitute. *United States v. Grace*, 461 U.S. 171 (1983). Supreme Court jurisprudence directs

21

reviewing courts to look at the purpose and goals of the speech in question, and to

determine if the proposed alternative *is as effective as the original forum allowed*.

*Id.* Here, to ask such a question is to answer the question.

Applying *Coakley* and *Saieg*, the objective of these Appellants is to be heard

by the women on their way to entering the EMW clinic, not in a loud, shouting

manner, but in a soft, non-confrontational, caring manner. The substitute offered

by Appellees, to be forced to shout from ***at least*** 5 feet away, ***while competing***

***with*** loudspeakers and the tactics of clinic escorts, is no substitute at all. *Coakley*,

573 U.S. 464 at 496.

Here, as in *Coakley*, "the police appear perfectly capable of singling out

lawbreakers." *Id.* at 495. And, as in *Coakley*, if the EMW Clinic can rely "on

video surveillance" to show to police conduct that is against the law, "we do not

see why they cannot do the same to support injunctions and prosecutions against

those who might deliberately flout the law." *Id.* at 495.

Instead, as in *Coakley*, Lt. Stewart testified that "fixed buffer zones would

'make our job so much easier.'" *Id.* In contrast, while "[a] painted line on the

sidewalk is easy to enforce, … the prime objective of the First Amendment is not

efficiency." *Id.* In fact, Lt. Stewart acknowledged what the Supreme Court

observed in *Coakley*, "[t]o determine whether a protestor intends to block access to

a clinic, a police officer need only order him to move" and "[i]f he refuses, then

there is no question that his continued conduct is knowing or intentional." *Id.*

"Given the vital First Amendment interests at stake, it is not enough for

[Appellees] simply to say that other approaches have not worked." *Id.*  Simply put,

this case is on all fours with the dispositive factors from *Coakley,* but even stronger

where Appellees' own witness admitted ***other measures were never even tried***.

Thus, the Ordinance violates the First Amendment's Free Speech guaranties.

The District Court found *Coakley* to be distinguishable simply because the

buffer zone at issue is "substantially smaller" than the buffer zone in *Coakley*,

[DE#55 at PageID#2292].  As noted, that conclusion completely misses the point

of the First Amendment implicating considerations discussed in *Coakley*.

Again, the Supreme Court in *Coakley* did not suggest that the 35-foot size

was ***the*** – or even ***a*** critical factor – in fact, the size of the zone is mentioned only

briefly.   Rather, the key distinctions the *Coakley* Court made were the fact that

these were "fixed buffer zones around abortion clinics," *id.* at 490, as opposed to a

floating buffer zone in *Hill*, and that the impact of the zones "compromise[d]

petitioners' ability to initiate the close, personal conversations," which reduced that

Plaintiff "to raising her voice at patients from outside the zone—a mode of

communication sharply at odds with the compassionate message she wishes to

convey." *Id.* at 487.  As a result, the Court suggested the lower courts were "wrong

to downplay these burdens on petitioners' speech." *Id.*  Engaging in the "well it's a

23

smaller zone" analysis that Appellees and the District Court do is equally "wrong." *Id.*

Overbreadth in the First Amendment context, as is the case here, requires that "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1054 (6th Cir. 2015). "Consequently, because it impairs a substantial amount of speech beyond what is required to achieve acceptable objectives, 'a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated.'" *Id., citing Citizens United v. FEC*, 558 U.S. 310, 336 (2010).

### C. Likelihood of Success -- The First Amendment's Free Exercise Guaranties and Kentucky's RFRA were violated

"[A] law that discriminates against religious practices usually will be invalidated because it is the rare law that can be 'justified by a compelling interest and is narrowly tailored to advance that interest.'" *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). That is because a "a law might appear to be generally applicable on the surface but not be so in practice due to exceptions for comparable secular activities." *Id.* "Do the four [categories] of exceptions in the [ordinance], and the kinds of [exceptions] allowed, remove them from the safe harbor for generally applicable laws? We think so." *Id.* "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized

24

exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 413-414. *See, also, Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63 (2020).

In response, Appellees argue that the Ordinance is content neutral. (R. 27 at 22-24). But *Roberts* makes clear that numerous secular exceptions within the Ordinance, but no exceptions for religious activity, compels the opposite conclusion.

Appellees likewise simply argue that there is "no substantial burden" on Ms. Minter's ministry under the First Amendment and Kentucky RFRA, but Ms. Minter's testimony is unrebutted that this Ordinance constitutes a "catastrophic" detriment to her ministry, with catastrophic before-and-after results. (Depo. Minter, DE#44, at 54-55; PageID#1855-1856).

In *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021), the Supreme Court explained that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." (emphasis in original). "Second, whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.*

25

Again, as in *Coakley*, the City's "interests include ensuring public safety outside abortion clinics, preventing harassment and intimidation of patients and clinic staff, and combating deliberate obstruction of clinic entrances." *Id.* Here, the City permits exceptions to the buffer zone for those (a) entering or leaving such facility; (b) traversing the sidewalk but only if they are reaching a destination; (c) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and (d) employees or agents of such facility acting within the scope of their employment. (DE#28-1, Exhibit 1, PageID#1491-1497).

But, as Lt. Stewart testified (and in doing so bound Appellees under FRCP 30(b)(6)), local groups – the sidewalk counselors – were not the people causing any issues. (Depo. Stewart, DE#47 at 49-50, PageID#2004-2005). Thus, excluding Appellants from the buffer zone in no way furthers Appellees' purported interests, and denying Appellants the same exception granted to people walking down the sidewalk, or escorting patients for the clinic, cannot be sustained.

Appellants have also demonstrated a likelihood of success under the First Amendment's Free Exercise Clause and the Kentucky RFRA. The District Court erred in holding to the contrary.

### D. Appellants also established irreparable harm, the harm to others factor, and that issuance of an injunction was in the public interest

26

Clear Sixth Circuit law establishes that the remaining factors are met where constitutional rights are infringed upon and so, in these cases, the likelihood of success factor is dispositive. *H.D.V. - Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009) (abuse of discretion not to grant preliminary injunction where constitutional violation found); *Roberts*, 958 F.3d 409; *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (irreparable harm from violation of rights).

The District Court acknowledged that irreparable harm was shown if likelihood of success was shown and, conversely, that it would not be shown if there was no showing of likelihood of success (DE#55 at PageID#2286-2287) *citing McNeilly v. Land*, 684 F.3d 611, 620-621 (6th Cir. 2012). Thus, the District Court's errors in its analysis of likelihood of success permeated the remainder of its analysis.

As for harm to others, again, case law is clear that there is no substantial harm to others where, as is the case here, the Government is forced to comply with the Constitution. *Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

But Ms. Minter's testimony also bears mentioning on the harm to others: Ms. Minter and her sidewalk counselors were able to change the minds of 3 to 6 women each month in the buffer zone, but since September, 2021, that number has fallen to

27

zero. (Depo. Minter, DE#44 at 54-55; PageID#1855-1856).  Simple math reveals that is between 12 and 24 babies in the womb whose lives were not "made easier" as a consequence of the Ordinance. *Id.*  The harm to dozens of unborn infants who lost the ability to have someone advocate on their behalf in the critical moments before their mother made a choice to terminate their life is substantial, and yet was casually disregarded by the District Court.

Finally, on public interest, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999); *Guzman*, 999 F.3d 353, 360.

## Conclusion

The District Court erred in denying the requested injunctive relief to Appellants.  Its decision should be reversed with instructions to enter the preliminary injunction, enjoining the challenged ordinance.

Respectfully submitted,

/s/Christopher Wiest_____
Christopher Wiest (KBA 90725)            Thomas Bruns (KBA 84985)
Chris Wiest, Atty at Law, PLLC           Bruns Connell Vollmar Armstrong
25 Town Center Blvd, Suite 104           4555 Lake Forrest Dr., Suite 330
Crestview Hills, KY 41017                Cincinnati, Ohio 45242
Tel:   513/257-1895                      Tel.:   513/312-9890
chris@cwiestlaw.com                      tbruns@bcvalaw.com

*Attorneys for Plaintiffs/Appellants Sisters for Life, Inc., Angela Minter, and Kentucky Right to Life Association, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I have served the foregoing upon the Defendants/Appellees, by electronic mail to their counsel, and through service of this motion via CM/ECF, this 16th day of May, 2022, as well as by filing same with the Court's CM/ECF system this same date.

*/s/Christopher Wiest*_____
Christopher Wiest (0077931)

## CERTIFICATE OF COMPLIANCE

As required by Fed. R. App. P. 32(g) and 6th Cir. R. 32(a), I certify that this Brief contains 6,434 words. This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

/s/ Christopher Wiest_____
